**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUMMIT RECOVERY RESIDENCES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TOWNSHIP OF RANDOPLH, NEW JERSEY,<br><br>Defendant. | Civil Action No. 26-2902 (SDW) (CF)<br><br>**OPINION**<br><br>September 28, 2026 |

**WIGENTON**, District Judge.

Before this Court are Plaintiff Summit Recovery Residences, LLC's ("Plaintiff" or "Summit Recovery") Motion for a Preliminary Injunction, (D.E. 8), pursuant to Federal Rule of Civil Procedure ("Rule") 65 and Defendant Township of Randolph's ("Defendant" or "the Township") Motion to Dismiss, (D.E. 19), pursuant to Rule 12(b)(6).[1] Jurisdiction is proper pursuant to 28 U.S.C. §§ 1131, 1343(3) and 42 U.S.C. §§ 3613(a) and 12133. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons stated herein, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Motion for a Preliminary Injunction is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[1] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein, unless otherwise indicated.

**A. Facts**

Plaintiff Summit Recovery Residences, LLC is a New Jersey limited liability company operating two Cooperative Sober Living Residences ("CSLRs") in the Township of Randolph, New Jersey.[2] (D.E. 1 (Compl.") ¶ 13.) The CSLRs are located at 17 Highview Terrace, Block 54, Lot 4 ("Highview Terrace") and 47 Wilkeshire Boulevard, Block 81.02, Lot 28 ("Wilkeshire Boulevard"), respectively. (Compl. ¶¶ 9–11.) A CSLR is "a residential setting that serves solely as a home for individuals who are recovering from drug or alcohol addiction and is intended to provide an environment where the residents can support each other's sobriety and recovery." N.J. Admin. Code § 5:27-2.1.

CSLRs are subject to the New Jersey Department of Community Affairs' ("DCA") regulations.[3] Pursuant to those regulations, a CSLR must be alcohol and drug free, house no more than ten recovering individuals, and have an on-site resident operator that establishes and enforces house rules.[4] *Id.* Notably, the organization licensed to run the CSLR is prohibited from providing food, laundry, financial, or other personal services, as well as on-site counseling, therapy, clinical treatment, or alcohol and/or drug treatment. *Id.* The purpose of a CSLR is "to provide newly sober individuals who have graduated from alcohol or substance abuse rehabilitation programs with a supervised transitional environment that assists them in returning to the residential community as independent, self-supporting individuals." (Compl. ¶ 17.) CSLR residents pay rent

---

[2] DBEK Renovations, LLC ("DBEK") owns both properties and leases them to Plaintiff. (Compl. ¶ 38; D.E. 8-3 5:21–23; D.E. 1-4 at 2.)

[3] The DCA, through the Bureau of Rooming and Boarding House Standards, requires CSLR operators to obtain a Class F license. N.J. Admin. Code §§ 5:27-1.6(a), (b)(6), -2.1.

[4] The regulations require management by two operators, "one of whom must be present on-site from 7:00 P.M. to 7:00 A.M. when residents are present, and at least one of whom shall reside in the residence and exercise some level of control over the operation of the residence." N.J. Admin. Code § 5:27-2.1.

and have individual or two-person rooms that are always accessible to staff and share common cooking and bathroom facilities. (Compl. ¶¶ 22–23.) The residents are also required to participate in the household's upkeep. (*Id.* ¶ 24.)

Plaintiff launched its first CSLR at the Highview Terrace location on June 20, 2022. (Compl. ¶ 25.) Approximately six months later, in December 2022, the Township enacted Ordinance 34-22, amending several provisions in its Zoning Code.[5] Plaintiff submits that Defendant's adoption of Ordinance 34-22 distinguished between CSLRs and Oxford House models with the intent to exclude CSLRs from single-family residential zones.[6] (*Id.* ¶ 30.) Plaintiff acknowledges that Ordinance 34-22 did not amend the Township's definition of "family."[7] (Compl. ¶ 32.)

On January 20, 2023, the Township served DBEK and its principal member, David Beck, with two Notice of Violation ("NOV") letters. (Compl. ¶¶ 35–36.) Pursuant to the first letter,

[5] Ordinance 34-22 amended Section 15-2.2 of the Zoning Code to: include definitions for both CSLRs and Oxford House model recovery homes; adopt Section 15-35.21, making CSLRs a conditional use and establishing a 200-foot requirement between CSLRs and other non-Oxford House model recovery homes; and amend Sections 15-26 and 15-31, making CSLRs conditional uses in the B-1 Neighborhood Business District and PO/R Professional Office and Residential District. (D.E. 1-1, Ex. 1 at 3–5.) Ordinance 34-22 made all other rooming houses and boarding houses prohibited uses in the B-1 and PO/R Districts. (*Id.* at 5.)

[6] Oxford House, Inc. is a Delaware not-for-profit corporation that "arranges leases of single-family homes on behalf of groups of individuals in recovery so that they may live together and support one another." *Oxford House, Inc. v. Twp. of N. Bergen*, 158 F.4th 486, 488 (3d Cir. 2025). Under the Oxford House model, the group agrees to be governed by three basic rules—(1) to be democratically self-governed, (2) to be financially self-supporting, and (3) to immediate expel any resident who relapses. *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 452 (D.N.J. 1992). There is no professional treatment, therapy, or paid staff on-site, and the houses are self-supporting, meaning each resident is responsible for their share of the expenses. *Id.* Residents pay rent and utilities, maintain the home, and communicate with their landlord. *Oxford House v. Twp. of N. Bergen*, 158 F.4th at 488–89. There are no Oxford House model recovery homes in the Township. (Compl. ¶ 30.)

[7] The Township's Zoning Code defines a family as "a group of persons living together as a single housekeeping unit and using certain rooms and cooking or bathing facilities in common." (Compl. ¶ 27 (quoting Randolph Mun. Code § 15-2.2).)

DBEK and Mr. Beck were to cease operating Highview Terrace within ten days, as it was not a permitted use in the R-3 Single Family Residential District since it was not a single-family use. (D.E. 1-3, Ex. 3B at 5.) The second letter notified DBEK and Mr. Beck that the Wilkeshire Boulevard CSLR was not a permitted use in the R-1 Single Family Residential District.[8] (D.E. 1-3, Ex. A at 3.) On April 4, 2023 Plaintiff launched operation of the Wilkeshire Boulevard CSLR. (Compl. ¶ 25.)

On February 15, 2024, the Township enacted Ordinance 02-24. (*Id.* ¶ 32.) Ordinance 02-24 amended Section 15-26 to subject CSLRs to the R-3 Zone District's bulk requirements and amended the PO/R Professional Office and Residential District requirements to read as follows:

> Cooperative sober living residence. All other rooming houses and boarding houses are prohibited. Structures are regulated under the residential regulations of the adjacent residential district. In the event that the lot(s) to be developed is adjacent to more than one residential district, the regulations of the most restrictive residential district shall apply even if the lot(s) is separated from the residential district by a street.

(D.E. 1-2, Ex. 2 at 4.) According to Plaintiff, it attempted to resolve the issue through negotiations, but the Township "adhered to its position that a CSLR was not a permitted use within a single-family residential zone." (Compl. ¶ 37.) On November 1, 2025, the Township issued three summonses to DBEK and Mr. Beck, alleging violations of the Randolph Municipal Code. (Compl. ¶ 38.) DBEK and Mr. Beck have pleaded not guilty.[9] (*Id.*)

On January 8, 2026, Plaintiff applied to the Township's Zoning Board ("the Zoning Board") for (1) an interpretation that a CSLR constitutes a single-family residence or, in the

---

[8] This letter was sent because the Township was notified that the proposed operator would be seeking a fire inspection "as part of the conversion to a [CSLR]." (*Id.*)

[9] The status of the municipal court matter is unclear. After this matter was filed, the municipal court adjourned a hearing initially scheduled for April 15, 2026 to July 15, 2026. (D.E. 17-1, Walters Decl. ¶ 18.)

alternative, (2) a use variance under the New Jersey Municipal Land Use Law, N.J. Stat. Ann. § 40:55D-70(d), for each CSLR in operation. (Compl. ¶ 39.) On March 12, 2026, the Zoning Board held a hearing solely on Highview Terrace's application for an interpretation. (D.E. 8-3 ("1T") 9:17–20, 10:22–25, 143:8–11.) Plaintiff's counsel, Ms. Walters, conducted a brief presentation, followed by testimony from Plaintiff's live-in operator, Mr. Jeffrey Thomas. (*See generally* 1T.)

Mr. Thomas' testimony provided further detail as to the CSLRs' operation. He explained that the DCA issued four Class F licenses for each CSLR—two operator licenses, a license to operate, and a license for the property owner. (1T 30:5–31:17.) He testified that in his experience as the live-in operator at Highview Terrace, the CSLR typically operates at almost full capacity with the average resident's stay being about 4 months. (*Id.* 53:4–7.) Each resident signs a "resident's agreement" and pays a $150 fixed-fee weekly rent, which goes directly to Plaintiff.[10] (*Id.* 53:23–54:20, 85:12–24.) At the conclusion of Mr. Thomas's testimony, both he and Plaintiff's counsel answered questions posed by board members and the public.[11] (*See, e.g.*, 1T 82:1–22.) However, the Zoning Board did not finish hearing all relevant testimony and adjourned further proceedings until April 9, 2026. (Compl. ¶ 39.)

[10] Mr. Thomas testified that Plaintiff is a for-profit business. (1T 135:23–25.)

[11] Plaintiff asserts that "members of the public expressed extreme vocal opposition to the presence of CSLR's in single family neighborhoods." (Compl. ¶ 39.) While this Court must "accept all factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff" at the motion to dismiss stage, it is not required "to credit factual allegations contradicted by indisputably authentic documents on which the complaint relies." *Al Ummah Cmty. Ctr. v. Teaneck*, No. 20-14181, 2022 WL 16948812, at *6 (D.N.J. Nov. 15, 2022). This Court's review of the March 12, 2026 hearing transcript—which Plaintiff attached to its moving papers for the Motion for a Preliminary Injunction—does not demonstrate "extreme vocal opposition." During the course of the proceeding, only one member of the public stated, "We don't want you here." (1T 110:23.) Those members of the public who chose to participate asked questions concerning DCA requirements and compliance, relevant case law, and how a CSLR operates, among other subjects. (*See, e.g.*, 1T 114:10–22 (inquiry from former occupant of 17 Highview Terrace regarding layout), 128:1–23 (exchange between public member and Mr. Thomas concerning how rules are made).)

At the April 9, 2026 hearing, members of the public finished asking Mr. Thomas their questions and the Zoning Board then heard expert testimony from Ms. Elisa Vicente, a clinical-licensed social worker. (D.E. 17-2 ("2T") at 9–53.) After a brief recess, the public comment period ensued, followed by another recess, after which the Zoning Board voted on Plaintiff's application for an interpretation solely as to the Highview Terrace location. (2T at 53–92.) All six members of the Zoning Board in attendance voted to deny Plaintiff's interpretation application. (*Id.* at 92–93.) Plaintiff's application for a use variance remains pending before the Zoning Board.

According to Plaintiff, Defendant's adoption of Ordinances 34-22 and 02-24, denial of the interpretation as to Highview Terrace, and continued threat of enforcement constitute discrimination against handicapped individuals in violation of their rights under relevant federal statutes. (Compl. ¶¶ 2, 4.) Plaintiff alleges that "[n]either the B-1 zone, nor the PO/R zone meets the requirements of a CSLR for community integration," because the B-1 zone's majority of permitted uses are commercial and the PO/R zone is physically unsuitable for a CSLR. (Compl. ¶¶ 33–34.)

**B. Procedural History**

On March 20, 2026, Plaintiff filed the instant lawsuit asserting violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, as amended (Count One); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (Count Two); and the Fourteenth Amendment's equal protection clause, pursuant to 42 U.S.C. § 1983 (Count Three).[12] (Compl. ¶¶ 43–62.) A week after filing its Complaint, Plaintiff moved for a preliminary injunction. (D.E. 8.) In both its Complaint and moving papers for the Motion for a Preliminary Injunction, Plaintiff requests that

---

[12] The FHA was amended in 1988 by the Fair Housing Amendments Act ("FHAA"). *Hansen Found., Inc. v. City of Atlantic City*, 504 F. Supp. 3d 327, 334 (D.N.J. 2020).

this Court enter a temporary restraining order and preliminary and permanent injunction enjoining Defendant from enforcing its Zoning Ordinance. (Compl. at 14; D.E. 8 at 6, 27.)

Defendant moved to dismiss this matter on May 11, 2026. (D.E. 19.) The parties timely completed briefing for both the pending motions before this Court. (D.E. 15, 17, 20, 21.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, federal courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff," and determine "whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). The analysis involves a two-step approach. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, the court parses between the factual and legal elements of a claim, treating "all of the complaint's well-pleaded facts as true," but disregarding any legal conclusions. *Id.*; *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Second, the court considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

When a plaintiff pleads factual content that enables the court to draw "the reasonable inference that the defendant is liable for the misconduct alleged," a claim has facial plausibility. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556

U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.* The court considers "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Belichick*, 605 F.3d at 230 (citation omitted).

**B. Rule 65**

Federal Rule of Civil Procedure 65 governs TROs and preliminary injunctions. Generally, a TRO temporarily preserves the status quo, *Hope v. Warden York County Prison*, 956 F.3d 156, 160 (3d Cir. 2020), while a preliminary injunction "grants 'intermediate relief of the same character as that which may be granted finally,'" *Brown v. Tolerico*, No. 16-9413, 2017 WL 838802, at *2 (D.N.J. Mar. 3, 2017) (quoting *De Beers Consolidated Mines v. United States*, 325 U.S. 212, 220 (1945)). "The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate." *Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16-3140, 2016 WL 4150748, at *6 (D.N.J. Aug. 3, 2016).

A party seeking a preliminary injunction must first establish (1) a likelihood of success on the merits and (2) that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). Only if the movant establishes these two factors does a court consider (3) whether granting preliminary injunctive relief will harm the nonmoving party or other interested persons and (4) the public interest. *Reilly*, 858 F.3d at 178–79. Lastly, the court "determines in its sound discretion if all four factors, taken together, balance

in favor of granting the requested preliminary relief." *Id.* at 179. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

## III. DISCUSSION

### A. Ripeness

Defendant asks this Court to deny Plaintiff's Motion and dismiss this case because Plaintiff's claims are not ripe for review given that the use variance applications are still pending before the Zoning Board. (D.E. 15 at 41–45; D.E. 19-1 at 24–26.) Plaintiff counters that it seeks only to preserve the status quo given the Township's demand that Plaintiff close its CSLRs as a condition to adjourn judicial enforcement and that it is not required to resort to administrative remedies that would be futile. (D.E. 17 at 13–14; D.E. 20 at 33–34.) Plaintiff contends Defendant's denial of the interpretation application, coupled with the public hostility faced, "make it evident that the Board will deny the variance application." (D.E. 17 at 14.)

"The ripeness doctrine serves to 'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Peachlum v. City of New York*, 333 F.3d 429, 433 (3d Cir. 2003)). In land-use matters, Supreme Court precedent requires that "state zoning authorities be given an opportunity to 'arrive[] at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question' before [an] owner has a ripe constitutional challenge based on the disputed decision." *Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1291 (3d Cir. 1993) (first alteration in original) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985)). This finality rule recognizes that "a

property owner suffers no mature constitutional injury until the zoning authority defines the application of the zoning ordinance and the harm to the owner." *Id.* It also recognizes that local political bodies are better-equipped to assess the benefits and burdens associated with land-use litigation and prevents the premature adjudication of zoning disputes. *Id.* Thus, this Court turns to consider how the finality rule and related doctrines apply to Plaintiff's claims.

**1. Discrimination Claims Pursuant to the FHAA and the ADA**[13]

"In 'as-applied' challenges to a new zoning ordinance, the claim is not ripe 'until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question.'" *Lapid Ventures, LLC v. Twp. of Piscataway*, No. 10-6219, 2011 WL 2429314, at *4 (D.N.J. June 13, 2011) (quoting *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 597 (3d Cir. 1998)). The finality rule does not apply to a facial challenge on a zoning ordinance, however. *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164, 166 (3d Cir. 2006); *see also CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 626–27 (3d Cir. 2013) (explaining that the finality rule does not apply to facial challenges because "it is not necessary to advance the rule's underlying purpose" of allowing courts to determine "the extent to which a particular plaintiff has been harmed by a zoning law").

The FHAA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). A handicap is "a physical or mental impairment which substantially limits one or more of [a] person's major life activities . . . but such term does not include current, illegal use of or addiction to a controlled substance." *Id.* § 3602(h). Alcoholism and drug addiction are covered

[13] Given the similarity between the requirements of the FHAA and the ADA, the FHAA analysis can be applied to ADA claims. *Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 914 (D.N.J. 2019). Given that Plaintiff fails to state a claim for discrimination under the FHA, this Court concludes it also fails to state a claim for violation of the ADA.

impairments. *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 459 (D.N.J. 1992). A plaintiff can allege violations of the FHAA under three types of claims: "(1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005).

Here, Plaintiff proceeds on theories of disparate treatment and refusal of reasonable accommodation. (D.E. 8-1 at 19 ("Discriminatory intent and refusal of reasonable accommodation are present in this case.").) The former mounts a facial attack and is not subject to the finality rule. *Cnty Concrete*, 442 F.3d at 164. The latter constitutes an "as-applied" challenge subject to the finality rule. *See Lapid Ventures*, 2011 WL 2429314, at *4 ("In 'as-applied' challenges to a new zoning ordinance, the claim is not ripe 'until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question.'" (quoting *Sameric*, 142 F.3d at 597)); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 451 n.5 (3d Cir. 2002) (explaining that implicit in the holding that courts deciding reasonable accommodations challenges to local land use decisions under the FHAA "should ordinarily limit their review to the administrative record," was the assumption that the plaintiffs bringing such claims "must usually first seek redress through variance applications"). Hence, it follows that Plaintiff's refusal of reasonable accommodation claim is unripe for review, as the use variance applications remain pending before the Zoning Board, but the disparate treatment claim may proceed. *See Lapid Ventures*, 2011 WL 2429314, at *6 (dismissing claims premised on failure to make a reasonable accommodation as unripe, but

concluding the plaintiffs' disparate treatment and disparate impact claims were ripe and could proceed).

Plaintiff argues that the circumstances demonstrate its efforts to seek a use variance will ultimately be futile, citing community opposition, the denial of the interpretation application, and the Zoning Board's super-majority requirement to grant the variance. (D.E. 20 at 33–34.) Yet Plaintiff offers scant evidence of community opposition and cannot point to any actions or statements made by Zoning Board members or other Township officials that show the use variance application process is futile. *See Hansen Found., Inc. v. City of Atlantic City*, 504 F. Supp. 3d 327, 341 (D.N.J. 2020) (rejecting futility argument where plaintiffs could only point to "a lengthy description of their applications and interactions with City officials"); *cf. Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 996 F. Supp. 409, 426 (D.N.J. 1998) (finding futility where "one of the most knowledgeable and influential figures within the Township . . . with respect to zoning and planning" offered uncontroverted testimony on behalf of the Township that it was "extremely unlikely" that a variance would be granted and that he would not recommend such a variance). Thus, this Court concludes only Plaintiff's disparate treatment claim pursuant to the FHAA may proceed.

**2. Equal Protection Claim**

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiff asserts an equal protection claim in Count Three. (Compl. at 13.) Plaintiff argues that the Township is expressly discriminating against Plaintiff by distinguishing between the Oxford House model of recovery homes—which are permitted in single family residential zones—and CSLRs—which are

not. (D.E. 8-1 at 23.) Plaintiff notes that "community hostility does not provide a rational basis to exclude CSLRs." (*Id.*)

The Third Circuit has applied *Williamson*'s finality rule to § 1983 cases involving land-use decisions and held that a property owner's claim is not ripe where zoning authorities have not had an opportunity to reach a final, definitive position "regarding how [they] will apply the regulations at issue to the particular land in question." *Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568, 574 (3d Cir. 2003) (alteration in original) (quoting *Taylor Inv.*, 983 F.3d at 1291); *Cnty. Concrete*, 442 F.3d at 164. Given that Plaintiff contests the application of the Zoning Ordinance to its CSLRs, this Court construes Count III as an as-applied challenge which is not yet ripe for review for the same reason expressed above. *See Cnty. Concrete*, 442 F.3d at 164.

However, even if this Court construed Plaintiff's claim to mount a facial challenge, Plaintiff has not pleaded that Defendant has violated its equal protection rights because it has not shown how it is similarly situated to Oxford Houses.

*a) CSLRs are not similarly situated to Oxford Houses*

To establish that a zoning ordinance denies equal protection, a plaintiff must first show it is "similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone." *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 137 (3d Cir. 2002). If the entities are similarly situated, then the city defendant must justify its different treatment by demonstrating the ordinance is rationally related to a legitimate government purpose. *Id.*; *Cnty. Concrete*, 442 F.3d at 171. Rational basis review applies since "the disabled are not a suspect class" for equal protection purposes. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3d Cir. 2007) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "Although defendants need only satisfy the lowest level of scrutiny, 'plaintiffs must prove the

existence of purposeful discrimination.'" *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, No. 19-14515, 2023 WL 6121195, at *6 (D.N.J. Sept. 19, 2023) (quoting *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009)). Proof of disparate impact is insufficient; a plaintiff must prove the defendant intended to discriminate. *Id.*

Plaintiff has not shown how a CSLR is similarly situated to an Oxford House. CSLRs vary from Oxford Houses in a few ways. First, in order to operate a CSLR, a Class F licensure from the DCA is required. Second, CSLR residents pay a fixed-fee rent to Plaintiff, are given gift cards for groceries, and are not responsible for household bills. (*Compare* 1T 53:23–54:20 (rent), 86:14–22 (gift cards for food), 87:11–19 (no responsibility for household bills), *with Oxford House v. Twp. of N. Bergen*, 158 F.4th at 488–89 (Oxford House residents pay rent and utilities).) Lastly, Plaintiff is a for-profit business, whereas Oxford Houses are not-for-profit. (*Compare* 1T 134:23–25, *with Oxford House v. Twp. of N. Bergen*, 158 F.4th at 488.) Given the differences between CSLRs and Oxford Houses, this Court concludes Plaintiff has not sufficiently pleaded an equal protection claim.

**B. Preliminary Injunction Motion**

**1. Likelihood of Success on the Merits**

*a) Disparate Treatment Claim*

Plaintiff argues Defendant's Zoning Ordinance is facially discriminatory because it permits Oxford Houses to operate in single family residential zones but prohibits them from doing so, notwithstanding the similarities between CSLRs and Oxford Houses. (D.E. 8-1 at 19–21.) In response, Defendant argues Ordinance 34-22 does not expressly exclude CSLRs from single family residential zones and that Plaintiff is conflating "an intent to exclude CSLRs, as of right,

from R-1 and R-3 residential zones with an intent to discriminate against those recovering from the disability of drug and/or alcohol addiction." (D.E. 15 at 34–36.)

"Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action." *Wind Gap*, 421 F.3d at 177. Yet "where a plaintiff demonstrates that the challenged action involves disparate treatment through explicit facial discrimination, or a facially discriminatory classification," the focus is on the "explicit terms of the discrimination," as opposed to a defendant's malice or discriminatory animus. *Id.* (first quoting *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 726 (3d Cir. 1995), then quoting *Int'l Union, United Auto. Aerospace & Agric. Implement Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Because the policy itself supplies the direct evidence of intent, courts "must examine the language of the challenged regulation or policy, aided, if applicable, by any evidence of record that informs the analysis." *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 284 (3d Cir. 2020) (quoting *Wind Gap*, 421 F.3d at 179).

"[T]he most fundamental element of [a facially discriminatory classification] claim is that plaintiff must demonstrate that defendant's alleged discrimination was 'because of a handicap.'" *Id.* (alterations in original) (quoting *Wind Gap*, 421 F.3d at 178). The relevant inquiry is "whether 'handicapped' or 'disabled' status—the protected trait under the FHAA—was being used as the basis for different treatment." *Wind Gap*, 421 F.3d at 178. A generally applicable regulation is not facially discriminatory, even when it expressly includes protected classes or their proxies, unless the different treatment was "disability based." *431 E. Palisade*, 977 F.3d at 285.

The Third Circuit's *431 East Palisade Avenue* decision is particularly instructive in this matter. There, developer plaintiffs sought to build a 150-bed assisted living facility in a "one-

family residence district," zoned R-AAA, in the City of Englewood. 977 F.3d at 280. The defendant City's zoning ordinance explicitly allowed "one-family dwellings" as one of seven uses in the R-AAA district. *Id.* at 280–81. The City's zoning ordinance did not define "assisted living facilities," but permitted them to be constructed as of right only in its "Research, Industrial, Medical (RIM) District." *Id.* at 281. When the City took no action on the plaintiffs' rezoning request, the plaintiffs filed a federal lawsuit alleging the zoning ordinance was facially discriminatory, among other claims, and sought a preliminary injunction, which the district court granted. *Id.* at 282.

On appeal, the Third Circuit held the zoning ordinance was not facially discriminatory. *Id.* at 283. The Third Circuit clarified that the proper scope of inquiry was the language contained within the ordinance concerning the R-AAA zone, rejecting the plaintiffs' argument that the court broaden its focus to analyze the ordinance's language for the RIM zone. *Id.* at 285. Turning to the R-AAA zone's language, the court concluded it was not facially discriminatory given "the absence of any language referring to individuals with disabilities." *Id.* at 285–86. Given that the text of the R-AAA zone did not mention assisted living facilities or persons with disabilities, the court disagreed with the district court's conclusion that the different treatment was "because of" a protected class. *Id.* at 287.

The court then considered whether the language regulating the RIM zone in conjunction with the R-AAA zone's language was facially discriminatory. *Id.* at 286–88. Although the language regulating the RIM zone explicitly included "assisted living facilities" as a permitted use, said inclusion did not "in itself restrict land use in the R-AAA zone," let alone another zone. *Id.* at 286. Even considering both provisions, "[t]he mere fact that some general terms in the ordinance operate[d] to disallow assisted living facilities and other terms expressly permit[ted them] as of

right in another district[] [did] not transform the ordinance into one that facially discriminate[d] on its face." *Id.* at 287.

Consistent with the Third Circuit's decision, this Court analyzes the language regulating R-1 and R-3 single family residential districts in the Township as these are the districts where the CSLRs are located. The language of both the R-1 and R-3 zones state that single family residential uses and "[a]ny principal use as permitted in the RR Residence Zone" are principal uses. Randolph Mun. Code §§ 15-15.1, -18.1. There is no express mention, let alone a prohibition, on CSLRs and thus these ordinances are not facially discriminatory. As the Third Circuit stated: "Failure to permit a land use as of right is not tantamount to an express prohibition." *431 E. Palisade*, 977 F.3d at 286.

Even considering the language of the R-1 and R-3 zoning districts with that of the B-1 and PO/R zoning districts, this Court concludes Plaintiff has not demonstrated that the Zoning Ordinance is facially discriminatory. The terms of the B-1 zone, which regulate the neighborhood business district, list CSLRs as a permitted principal use, subject to the R-3 zone district's bulk requirements and prohibit all other rooming and boarding houses. Randolph Mun. Code § 15-26.2(A)(8). CSLRs are similarly listed as a permitted principal use for the PO/R Professional and Residential District but are instead subject to "the residential regulations of the adjacent residential district." Randolph Mun. Code § 15-31.2(A)(5). The inclusion of CSLRs as permitted principal uses in the B-1 and PO/R zones while they are not explicitly listed as permitted uses in the R-1 and R-3 zones is not indicative of disparate treatment. *See 431 E. Palisade*, 977 F.3d at 287.

Further, the remaining evidence in the record does not demonstrate discriminatory intent. As discussed above, *see* n.11, Plaintiff does not provide evidence of "extreme" community opposition. At the Zoning Board hearings, Zoning Board members permitted members of the

public to ask their questions and would instruct them to keep their questions tailored to the testimony offered and the interpretation application before the Board. (*See, e.g.*, 1T 20:6–10, 110:23–111:1, 112:19–113:17); *cf. United States v. Borough of Audubon*, 797 F. Supp. 353, 361 (D.N.J. 1991) (finding discriminatory animus because "on several occasions, Audubon officials stated that they agreed with or were responding directly to community opposition which was clearly discriminatory"). Additionally, by Plaintiff's own admission, the Ordinance did not change the definition of "family." (D.E. 8-1 at 11; Compl. ¶ 32.)

Given that the text of the Zoning Ordinance is not facially discriminatory, and the record does not demonstrate discriminatory intent, this Court concludes Plaintiff fails to show a likelihood of success on the merits on its FHA claim.

**2. Irreparable Harm**

Irreparable harm "is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000). Some courts in this Circuit find a rebuttable presumption of irreparable harm where there is a substantial likelihood the defendant violated the FHA. *Oxford House, Inc. v. Twp. of N. Bergen*, No. 21-19260, 2022 WL 2341630, at *6 (D.N.J. June 29, 2022). Irreparable harm cannot be presumed here because Plaintiff has failed to make the threshold showing of a likelihood of success on the merits of its FHA claim. *See id.*

Plaintiff argues its members will be irreparably harmed because "[i]f the homes were forced to close, most residents would likely lose stable housing." (D.E. 8-1 at 25.) Plaintiff conflates receiving Notices of Violation with being shut down. In fact, Plaintiff's argument is undermined by the fact that it received NOVs in January 2023 and despite the passage of time—

over three years to be exact—it remains operational. The Township's pursuit of recourse in municipal court earlier this year also has not led to the closure of the CSLRs and Plaintiff does not present evidence that its residents are at risk of eviction. Further, both the municipal court and use variance application matters remain pending. The record does not support the inference that the events earlier this year somehow place the CSLR residents at a greater risk than they were back in January 2023 upon receipt of the NOVs. Thus, Plaintiff has not demonstrated irreparable harm.

In sum, Plaintiff's Motion for a Preliminary Injunction is denied because Plaintiff fails to show a likelihood of success on the merits and irreparable harm. *See Reilly*, 858 F.3d at 178–79.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Motion for a Preliminary Injunction is **DENIED**. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Parties
Cari Fais, U.S.M.J.